No. A-CV-31-79

COURT OF APPEALS OF THE NAVAJO NATION

December 16, 1980

LaSalle and Emma Jean HALL, Appellants,

vs.

Eddie J. ARTHUR, Appellee.

George J. Ahlmann, Esq., Navajo, Navajo Nation (New Mexico), for Appellee and James Jay Mason, Esq., Gallup, New Mexico, for Appellants.

## I. PROCEDURAL HISTORY

This matter comes to us on appeal from the Judgment entered on October 19, 1979 by the Honorable Homer Bluehouse, District Judge of the Navajo Nation in case number CH-CV-138-79.

A notice of appeal from this Judgment was filed on November 15, 1979, and a Motion for Trial De Novo and Appellants' Brief were also filed by Defendant on that day. A Motion for Reconsideration was filed on November 15, 1979 in the District Court of the Navajo Nation and refiled on November 18, 1979, with a corrected caption, copy having been received in the Court of Appeals on November 27, 1979. A Motion to Dismiss Appeal was filed on December 5, 1979. Defendants' Motion for Reconsideration in the District Court was denied by Judge Bluehouse on December 28, 1979. The Motion to Dismiss Appeal was denied on March 17, 1980 and Appellee's Brief was filed on March 31, 1980.

The matter was set for Trial De Novo on May 28, 1980, at Window Rock and at that date and place trial de novo was held.

We note, initially, that because this matter was heard trial de novo, we must vacate the judgment of the District Court, whether or not this matter came to us as an appeal on the record, we would have affirmed, reversed or modified that judgment. This is simply a reflection of a trial de novo in which a matter is heard without regard to prior proceedings and the prior determination. That is to say, we render our decision just as if trial had never been held before Judge Bluehouse at Chinle in September of 1979.

## II. FACTS

While the original lease between the Navajo Nation and Eddie J. Arthur ("Arthur") and Danny Peshlakai ("Peshlakai") was never intro-

duced into evidence, it appears from documents which were introduced into evidence that the Navajo Nation entered into lease No. CH-67-40 in 1967 with Arthur and Peshlakai for certain property within the Chinle community to be used for auto repairs and a gas station.

Apparently, under the terms of this lease, the lessees were obligated to pay the Navajo Nation two cents per gallon for fuel sold and 5% of the gross receipts from sales of all other items with a minimum annual rental of $1,200.

On October 1, 1972, a sublease for these premises was entered into by Arthur and Peshlakai with Mr. and Mrs. LaSalle Hall ("Hall"). This sublease was for a term of three years, and provided for rental to the sublessors in the amount of $379.60 per month in addition to the obligation of the sublessee to pay to the Navajo Tribe the amounts called for in the lessees' principal lease with the Navajo Tribe. The sublease was duly approved by Navajo Tribal Chairman Peter MacDonald on May 10, 1973, and approved by the Acting Assistant Area Director, John J. Bokan, on May 11, 1973.

While the testimony is somewhat in conflict, it appears that the Halls remained in possession of the leased premises following the expiration of this sublease ("the first sublease"). Apparently, because he had taken a position with the Bureau of Indian Affairs, Arthur had assigned his interest in the lease with the Navajo Nation to his son, Edvis J. Arthur ("Edvis") and on February 11, 1977, a second sublease was entered into which by its terms had the Halls as sublessors and Peshlakai and his wife and Edvis as sublessees ("the second sublease"). It is apparent to the court that it was intended that this sublease reflect that the Halls were sublessees and that the Peshlakais and Edvis were sublessors.

Like the first sublease, this sublease also called for rental to be paid to the sublessors at the rate of $379.60 per month and payment to the Navajo Tribe of those sums due and owing under the terms of the original lease.

Pursuant to the terms of the second sublease (Par. 10(d)), it was subject to termination for cause in the event of default or breach of any of its terms. The sublessors were required to give written notice of default, and failure to correct the default would terminate the sublease.

The second sublease was approved for the Navajo Tribe by Vice Chairman Wilson C. Skeet and approved by the Bureau of Indian Affairs on April 8, 1977, again by Acting Assistant Area Director, John Bokan.

On November 7, 1978, the Peshlakais' conveyed such interests as they might have in the original lease to Arthur in return for payment of five thousand dollars ($5,000) to be made in installments plus four whitefaced cattle. The assignment agreement had been executed as an assignment of Trader's Lease on August 25, 1978, and Arthur assumed the lease on that day. The assumption was approved by the Vice Chairman Wilson C. Skeet on November 16, 1978, and also approved on that day by the Bureau of Indian Affairs.

While the documentation is somewhat confusing, it also appears that on October 15, 1978, Edvis transferred his interest to his father, Eddie J. Arthur, and this assignment was approved by Navajo Tribal Chairman Peter MacDonald on November 7, 1978, and by the Bureau of Indian Affairs on November 16, 1978.

On April 12, 1979, a letter was sent from Arthur to the Halls notifying them that they were in default of their performance under the second sublease. The Halls were given thirty days within which to cure the default. The apparent item of default was a failure to make a payment of $379.60 per month to Gulf Oil.

(The Court notes that nowhere in either sublease is there language calling for payments of $379.60 per month to Gulf Oil but rather payment of three hundred seventy nine dollars and sixty cents ($379.60) per month to the sublessor).

On May 24, 1979, this action was commenced by Arthur against the Halls. Following trial in September of 1979, judgment was entered on October 19, 1979.

## III. THE PARTNERSHIP QUESTION

One of the principal items in dispute in this matter is whether or not there was, in fact, a partnership between LaSalle Hall and Eddie J. Arthur. The evidence and testimony on this point is confusing, at best. -It is certainly true that no writing or formal agreement is required to create a partnership. It is also true, however, that a partnership is normally thought of as a voluntary relationship created by deliberate action by two or more parties.

While it is true that insofar as obligations to the third party are concerned, individuals may be deemed to have created a partnership even though one or both of the individuals deny the partnership's existence, but it is unusual for a Court to find a partnership existing in the absence of a written agreement and in the absence of clear and convincing evidence that the parties intended that a partnership exist.

The evidence that the Internal Revenue Service assigned an employer identification number to what was referred to as the "Eddie J. Arthur-LaSalle Hall, Ptr", certainly indicates that a partnership may well have existed, but without evidence as to how this number was obtained--that is to say, was it by application signed by both partners; an applicaton submitted by an accountant, or what --we cannot hold that this employer identification number in and of itself conclusively established a partnership. (The reason for the concern of the existence of a partnership lies in the Defendants' claim that the existence of a partnership excused the payment of rent).

Because only the parties to this supposed partnership (and Hall's wife, Emma) are parties to this litigation we find that there are no third parties who have appeared in this action whose interests are affected by the question of the existence or non-existence of the partnership. We find, therefore, that the existence or non-existence of a partnerhip is not essential to our determination of the issues in question in this matter.

We, therefore, make no finding as to the question of whether or not a partnership ever existed between Eddie J. Arthur and LaSalle Hall. In the event there is a subsequent action brought by a third party, perhaps a creditor of Arthur or Hall or both of them, the the question of whether or not a partnership in fact or "partnership by estoppel" existed, may be determined.

## IV. IMPAIRMENT OF CREDIT CLAIM

Arthur's principal monetary claim arises out of an allegation that Hall's failure to fulfill the terms and obligations of the subleases damaged Arthur's credit and thus precluded him from obtaining a $30,000 loan from the Navajo Nation Revolving Credit Fund.

The basic principle of contract law is that in the event of a breach of contract, the innocent party is entitled to receive what he would have received had the contract been fully performed. Contract law is not criminal law. Contract law looks at people behaving in a commercially reasonable manner.

The person against whom a breach of contract is made is not entitled to sit back and to expect that that which had been promised will still be performed (at least after the breach is made clear). The person who has been injured must take reasonable steps necessary to protect his position.

For example, if a person contracts to provide shelter for certain fragile objects and the owner finds that the person who was supposed to provide shelter has failed to, then the owner must take such steps as necessary to protect his goods and cannot permit those goods to be damaged and then expect to recover in full from the party who broke his promise. Surely, the owner of the goods would be paid for whatever it would take him to protect his goods, but the duty of the owner to protect the goods is clear.

In this case, Arthur applied for a loan of $30,000 from the Navajo Nation Revolving Credit Fund. Had the loan been granted, Arthur would not have received $30,000 "free", but instead would have received a loan of $30,000 which would have had to be paid back with interest.

Thus, assuming that Hall broke his promises under the sublease agreements, and as result of this promise Arthur was denied a loan, then what Arthur suffered would have been whatever it took to go out and get a loan from someone else.

If, for example, a loan from the Navajo Tribe would have had an interest rate of 7% and a loan from an outside lender would have borne interest at a rate of 10%, then Arthur would have been damaged by the breach of contract to the extent of a differential interest rate of 3%. If Arthur had to pay additional money to secure the outside loan, whether in the form of accountant's fees or travel expense or whatever, those would be damages which Hall could be called upon to pay Arthur.

To require Hall to pay Arthur the entire amount of the loan would put Arthur in a better position then he would have been if the loan had been made.

However, we find that the evidence does not establish that the action of Hall caused the rejection of the loan from the Navajo Tribe. The letter from the chairman of the Central Credit Committee, Council Delegate Guy Gorman, of March 13, 1979, introduced into evidence, indicates that Arthur's credit problem extended back far before the original arrangement with Hall and far before the claimed breach of the sublease agreements. It is clear to us that while Hall's failure to make payments to Arthur, or more specifically to the Navajo Tribe, under the sublease agreement may have presented problems for Arthur when he sought a loan from the Central Loan Committee, we cannot say that

Hall's failure to fulfill the sublease agreement caused the turndown of Arthur's loan.

> "no recovery is allowed when resort to speculation or conjecture is necessary to determine whether the damage resulted from the unlawful act of which complaint is made or from some other source."
> 22 Am.Jur.2d Damages §24

Certainly, Arthur might have been able to take steps to convince the Central Loan Committee that the obligation to pay rent was in the sublessee, and not in himself, and might have produced copies of the sublease agreements which had been approved by the Tribal Chairman and Vice-Chairman and which were also approved by the Bureau of Indian Affairs. Nothing in Council Delegate Gorman's letter of March 13, 1979, shows any effort was made by Arthur to provide the Central Loan Committee with information as to Hall's obligation and non-performance which information might have enabled Arthur to obtain the loan in question.

## V. CLAIMS BY THIRD PARTIES

Other claims made by Arthur in this litigation involve payment of monies allegedly due to Gulf Oil Corporation, to the Navajo Tribe, and to the Navajo Tribal Utility Authority. None of these creditors were made parties to this litigation, nor did any of these creditors join this litigation. Under these circumstances, we are unable to determine what monies, if any, are owed to these creditors, and therefore, do not determine, based on the facts presented to us, who, if anyone, is liable for payment.

If and when an action is brought by any or all of these creditors against Arthur or Hall or both of them, then an appropriate determination of responsibility for payment and the amount of payment can be made. We, therefore make no finding as to liability or damages with respect to claims of creditors.

To provide guidance for the future we hold that in cases such as this, in which there are obligations to third parties, it is not appropriate for the Courts of the Navajo Nation to award damages based upon the amount owed to persons, or corporations, or governments which are not a party to the litigation. All that a District Court could properly do under such circumstances would be to determine the relative rights of the parties before it.

Not only is it inappropriate for a District Court to determine the amount owed to a person not a party to the litigation, it is also not appropriate for a court to determine which of two parties is liable to such person not a party to the court. In this case, for example, it would not be appropriate for us to say that such monies which may be owed to Gulf are to be paid by Hall and not Arthur or vice versa. Without the presence of the creditors, to make such a judgment might well be prejudicing the ability of the person or company not a party to collect such sums as may be due.

All that a District Court could do in a case such as this would be to determine as between the parties which is responsible for pay-

ment. Thus, if the evidence presented to us had shown that Arthur were primarily liable to the Navajo Tribe for rental under the main lease, a judgment could have been entered which said that in the event the Navajo Tribe recovers against Hall for the amount of rental due, then Hall will have judgment over against Arthur for this amount.

Under the facts presented to us, however, we must decline to enter judgment on the question of obligations of the parties to third party creditors and leave such determination for future actions, if any are brought by such creditors.

We note here a seeming lack of interest by the Navajo Nation and Gulf Oil Corporation in collecting monies apparently due them. We presume that Gulf Oil Corporation is fully capable of handling its own affairs, but we are concerned that the Navajo Nation has permitted an apparent delinquency to exist for so many years.

## IV. SUBLEASE RENTAL

On the record before us we are unable to make a determination of the amount, if any, owed by Hall to Arthur. We are concerned that the most recent sublease named the Halls as the sublessors and Peshlakai and Arthur as the sublessees. This sloppy documentation and sloppy recordkeeping is evident throughout the relationship between Arthur and Hall.

It is clear to us that Hall has made some payments. It is clear to us, that assuming the subleases are reformed to reflect the probable intention of the parties that the Halls are, in fact, sublessees, that Hall owed $379.60 per month to Arthur (or Arthur & Peshlakai) for the entire period of both subleases and in all likelihood for the period between the subleases.

The award of damages, however, must be based upon proof, not speculation. Given the state of record, given the payments made by Hall to Arthur, whether as a partner or to an employee, we are simply unable to determine that any particular sum of money is, in fact, owed by Hall to Arthur. We, therefore, make no award for back rent to Arthur and enter no judgment against Hall.

## VII. PERSONAL PROPERTY

Pursuant to a writ of execution from the District Court of the Navajo Nation for the Judicial District of Chinle, Plaintiff Eddie J. Arthur seized personal property in the possession of the Defendants, LaSalle Hall and Emma Jean Hall. Since the Judgment of the District Court is vacated, the writ of execution issuing therefrom is hereby quashed, and all personal property seized as a result of the District Court's Judgment should be returned to the Defendants. All costs and expenses incurred by Plaintiff in seizing and storing said property, shall be the sole responsibility of Plaintiff.

## VIII. TERMINATION OF THE SUBLEASE

While we are unable to determine what amounts, if any, are owed by Hall or Arthur, we are able to determine, even from the confused state of the evidence before us, that Hall was and is in default under

the terms of the sublease from Arthur. We, therefore, cancel the sublease entered into on February 11, 1977. We, therefore, find that Eddie J. Arthur, and Eddie J. Arthur, alone, is entitled to possession of the premises set forth in Lease No. CH-67-40.

## IX. ATTORNEY'S FEES

The American rule is that attorney's fees will not be awarded to the successful party, but rather that each party in litigation must bear the costs of his own attorney's fees. Exceptions to this rule have been created by federal and state statutes, and in certain circumstances such as contempt proceedings where the action of a party may be properly viewed as vindicating the authority and dignity of the court.

We are reluctant to fashion a judge-made rule which would vary this American rule. We would prefer that the Navajo Tribal Council, as the governing body of the Navajo Nation, approve any deviation from this general rule.

We recognize that in certain circumstances, such as contracts calling for payment of attorney's fees, that attorney's fees of the prevailing party are properly paid by the losing party.

Even if we were not to follow the American rule and instead were to adopt a rule that the prevailing party is entitled to payment of his attorney's fees, under the confused state of this case and given our opinion and judgment, we would not award attorney's fees in this matter because it is hard to say who the prevailing party is.

We, therefore, make no award of attorney's fees in this matter and direct that each party is to bear its own costs.

For the future, we adhere to the American Rule, at least until action to the contrary by the Navajo Tribal Council: that is to say, each party must bear its own attorney's fees in the absence of a special set of circumstances such as a contempt proceeding or where a contractual agreement between the parties calls for payment of attorney's fees. (If a contractual arrangement calls for payment of attorney's fees, then in the event one party substantially prevails, that party shall be awarded its attorney's fees).

We note, for future reference of parties and counsel, that in calculation of attorney's fees, the court shall determine, on its own, what fair attorney's fees would be, without regard to whether attorney's fees have been paid or owing and the amount of such fees.

## X. OTHER COMMENTS

We note that a question which recurs repeatedly, is the liability of a sublessee who is a non-Navajo to the Navajo Tribe for lease rentals during a period which is claimed to be a development period under a lease originally awarded to a Navajo lessee. We are concerned over the tremendous number of leases within the Navajo Nation which were awarded to Navajos, but which in turn, have been subleased to non-Navajos. We would hope that the Advisory Committee of the Navajo Tribal Council would provide guidance in these matters. Should the Advisory Committee not take action to clarify these questions, we will find it necessary in a proper case to reach and decide the question of the proper interpretaton of waivers of rental during periods of development.

XI. JUDGMENT

Judgment, therefore, shall be entered in accordance with this opinion.

THIS MATTER, having come before the Court of Appeals for trial de novo on May 28, 1979, and the Court of Appeals being fully advised in the premises, it is hereby ordered, adjudged and decreed as follows:

1. The judgment of the District Court of the Navajo Nation for the Judicial District of Chinle, entered on October 19, 1979, in Case Number CH-CV-138-79 be, and the same hereby is vacated.

2. That possession of the Chinle Gulf Station as said premises are described in Lease No. CH-67-40, between the Navajo Tribe as Lessor and Eddie J. Arthur and Danny Peshlakai, as Lessees and the rights, duties and obligations of said lease are hereby awarded to Eddie J. Arthur.

3. All property seized by Plaintiff, Eddie J. Arthur, under order of the District Court of the Navajo Nation for the Judicial District of Chinle, or any other Court, shall immediately be released to Defendants, LaSalle Hall and Emma Jean Hall. Plaintiff, Eddie J. Arthur, shall be liable for any costs and expenses of seizing and storing said property.

4. Except as above provided, Plaintiff-Appellee and Defendants-Appellants shall take nothing and each shall bear their own costs.